**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 10-41480-MSH |
| DAVID GEMME | ) | |
| Debtor | ) | |
| | ) | |
| LACHANCE FINANCIAL SERVICES, INC., | ) | |
| | ) | Adv. Pro. No. 10-04099 |
| Plaintiff | ) | |
| v. | ) | |
| DAVID GEMME, | ) | |
| Defendant | ) | |

**MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

The defendant, David Gemme, who is the debtor in the main bankruptcy case, seeks summary judgment in this adversary proceeding pursuant to Fed. R. Civ. P. 56, made applicable by Fed. R. Bankr. P. 7056. The plaintiff, LaChance Financial Services, Inc. ("LFS"), opposes.

**Facts**

The following facts are based on the pleadings and affidavits, which include deposition transcripts, filed in this proceeding. In June 2007, Mr. Gemme, in his capacity as president of GEM Builders, Inc. ("GEM"), approached LFS about obtaining a working capital loan for GEM. Mr. Gemme had no prior relationship with LFS. By letter dated June 14, 2007, LFS proposed to lend GEM $215,000. The proposal stated that the loan was to be secured by a first mortgage (the

1

"Charlton/Oxford Mortgage") on property located at 54 Buffum Road, Charlton, Massachusetts and Rocky Hill Road, Oxford, Massachusetts (the "Charlton/Oxford Property"), which the proposal noted was owned by GEM, and a third mortgage (the "Casey Road Mortgage") on property located at Casey Road, Charlton, Massachusetts (the "Casey Road Property"), which the proposal also noted was owned by GEM.   The proposal called for Mr. Gemme and two affiliates, Elly Pond Estates, LLC ("Elly Pond") and Willow Tree Farms, LLC ("Willow Tree"), to guarantee the loan.   LFS's proposal was accepted by GEM, Mr. Gemme, Elly Pond and Willow Tree.   Mr Gemme on behalf of GEM submitted to LFS a credit application dated June 18, 2007 which included Mr. Gemme's authorization to obtain his personal information.

On June 28, 2007, Mr. Gemme and GEM, as co-borrowers, executed a promissory note payable to LFS in the amount of $215,000.   The note provided for monthly payments of interest only until maturity twelve months from the date of the note[1] with a right to extend maturity as long as the borrowers were not then in default.   Also, on June 28, 2007, the Charlton/Oxford and Casey Road Mortgages were executed.   The typewritten text of the Charlton/Oxford Mortgage states that "GEM Builders, Inc." grants LFS a mortgage on the Charlton/Oxford Property.   The Charlton/Oxford Mortgage also contains handwritten changes.   Preceding the text "GEM Builders, Inc." is the handwritten addition "David E. Gemme individually and as president of." In the signature block after the typewritten text "David E. Gemme, President" is the handwritten addition "& individually." The Casey Road Mortgage contains no handwritten changes.   Both Mr. Gemme and Lawrence LaChance, president of LFS, testified by affidavit or in deposition that

---

[1] Although the note was dated July 5, 2007 and provided for a loan period of twelve months, the note also provided a maturity date of June 4, 2008.

2

when the Charlton/Oxford Mortgage was executed by Mr. Gemme at the closing there were no handwritten insertions or changes to that instrument.

Subsequent to the closing, LFS transmitted to its attorney, David Rocheford, Jr., the mortgages and other documents for recording at the Worcester District Registry of Deeds. The letter of instructions accompanying the instruments requests Mr. Rocheford to perform the following services:

"Services Requested:

1. Record the mortgages…

2. Provide a title search on both properties."

Between the time the Charlton/Oxford Mortgage was executed on June 28, 2007 and the time it was recorded by Mr. Rocheford on July 5, 2007, the handwriting notations altering the grantor from GEM to David E. Gemme individually and as president of GEM had been inserted. Mr. LaChance testified at his deposition that he assumed the handwritten insertions were made after the documents had been sent to Mr. Rocheford.

Based on the foregoing and the fact that on June 28, 2007 the Charlton/Oxford Property was not owned by GEM but by Mr. Gemme individually, I find that when Mr. Rocheford performed his title examination prior to recording the mortgages he discovered the fact that the Charlton/Oxford Property was owned not by GEM but by Mr. Gemme and in an effort to conform the Charlton/Oxford Mortgage to the title he made the handwritten insertions changing the grantor to include Mr. Gemme individually.

When the Charlton/Oxford Mortgage was recorded on July 5, 2007, it became a third priority mortgage on the Charlton/Oxford Property behind two prior mortgages to other lenders.

While Mr. LaChance testified in his deposition that he would never have allowed the loan to close had he known the Charlton/Oxford Mortgage would not enjoy first priority status and that LFS's June 14, 2007 written loan proposal required first priority status, this piece of critical information was never conveyed to LFS's attorney, Mr. Rocheford.   Nowhere in LFS's instructions to Mr. Rocheford was Mr. Rocheford told that the Charlton/Oxford Mortgage had to be a first priority mortgage on the Charlton/Oxford Property.

The evidence is inconclusive as to whether Mr. Rocheford submitted a title search report to LFS at the time of the loan closing as he had been instructed.   This title search would have disclosed to LFS the fact that it had not obtained a first priority mortgage on the Charlton/Oxford Property.   Assuming the title search had indeed been supplied, clearly no one at LFS paid the slightest attention to it, and assuming Mr. Rocheford had neglected to supply it, no one at LFS appears to have made an effort to obtain it, because LFS admits that it first learned of the Charlton/Oxford Mortgage's subordinate position in June, 2010, by which time the Charlton/Oxford Property had been sold at foreclosure by the holder of the first priority mortgage on the property.   LFS received nothing from the foreclosure proceeds.

Between August 1, 2007 and February 2, 2009, GEM made $68,651 in interest payments to LFS through automatic withdrawals from GEM's bank account.   Thereafter GEM ceased making payments.   On March 30, 2010, Mr. Gemme commenced his bankruptcy case.   LFS then initiated this adversary proceeding seeking a determination that Mr. Gemme's debt to it is nondischargeable, advancing the following arguments in its three-count amended complaint: (1) that the debt is nondischargeable under § 523(a)(2)(A) because it was obtained by false representations; (2) that the debt is nondischargeable under § 523(a)(6) because the false

4

representations constitute a willful and malicious injury to the property of LFS and (3) that the debt is nondischargeable under § 523(a)(2)(B) because it was obtained by submitting false statements respecting Mr. Gemme's financial condition.   Mr. Gemme seeks summary judgment on all counts.

## Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 65(c), made applicable by Fed. R. Bankr. P. 7056.   A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve it in favor of the nonmoving party.   *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 427 (1st Cir. 1996)).   "Material" means that a disputed fact has "the potential to change the outcome of the suit" under the governing law if the dispute is resolved in favor of the nonmovant.   *McCarthy v. NW. Airlines, Inc.* 56 F.3d 313, 314-15 (1st Cir. 1995).   The moving party bears the initial responsibility of informing the court of the basis for its motion and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and . . . [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**Discussion**

Count I: Section 523(a)(2)(A)

LFS asserts its claim is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code which makes nondischargeable "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  In order to prove that a debt is nondischargeable under § 523(a)(2)(A), the creditor must show that: (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; (2) the debtor intended to deceive the creditor; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false statement caused damage. *Douglas v. Kosinski (In re Kosinski)*, 424 B.R. 599, 612 (1st Cir. BAP 2010).

LFS claims Mr. Gemme misrepresented to it that the Charlton/Oxford Property was owned by GEM and that LFS would receive a first mortgage on that property.  It is questionable whether Mr. Gemme's countersigning as "accepted and agreed" the June 14, 2007 LFS loan proposal rises to the level of a misrepresentation when the loan proposal was drafted by LFS and contains, not as a condition to closing but merely as a descriptive part of the loan terms, a reference that the loan would be secured by a first mortgage on the Charlton/Oxford Property.  Even if it did, the question nevertheless remains: was LFS's reliance on that misrepresentation justifiable?

In *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 73 (1st Cir. 1998), the lender relied on misrepresentations by the debtor that he was the title holder of the mortgaged property.  The bankruptcy court as affirmed by the Bankruptcy Appellate Panel for the First Circuit, held that reliance on the debtor's statements was not justified because the lender "could have conducted a

6

routine title search and discovered that [the debtor] no longer owned the home he pledged as security for the loan." *Id.* at 75. On appeal the United States Court of Appeals for the First Circuit reversed, stating that

> In light of [the debtor's] extensive and trustworthy relationship with [the lender] . . . , [the lender] was not required to take the investigative step of obtaining a title search to confirm those statements. The law is clear that [the lender] was entitled to rely on the statements unless there were warning signs of their falsity, even if obtaining a title search was easy and a matter of bank policy.

*Id.* (internal citations omitted). The First Circuit concluded that "[c]ertainly, the representations of a long-time customer with a reputation for honesty and trustworthiness and an excellent track record of consistent loan repayments was a basis on which to justify reliance." *Id.* at 76.

Here Mr. Gemme and GEM had no relationship whatsoever with LFS until the meeting in June 2007 just prior to LFS's issuing its loan proposal. There was no justification, therefore, for LFS to cut corners by departing from the virtually universal lending practice of instructing a title examiner to verify the priority of a mortgage before recording it. *See Banknorth, N.A. v. Sanders (In re Cassar)*, 325 B.R. 62, 65 (Bankr. D.N.H. 2005) (distinguishing from *Sanford* on the grounds that the debtor did not have a long-standing relationship with the bank). Indeed, Mr. Rocheford preformed a pre-recording title search for LFS and upon discovering that the Charlton/Oxford Property was owned by Mr. Gemme not GEM, took pen in hand in an attempt to conform the Charlton/Oxford Mortgage to the tile. Unfortunately, LFS failed to instruct Mr. Rocheford also to ensure that LFS's mortgage was a first priority mortgage. LFS's failure to so instruct its title counsel was not justified in the circumstances of this case. Because LFS' reliance on Mr. Gemme's misrepresentations, if they were misrepresentations, was not justified, Mr. Gemme is entitled to summary judgment on count I of the amended complaint.

Count II: Section 523(a)(6)

7

LFS argues that Mr. Gemme's misrepresentations concerning the ownership of and encumbrances on the Charlton/Oxford Property constituted a willful and malicious injury of LFS's property under Bankruptcy Code § 523(a)(6). Under the statute, a discharge does not relieve a debtor from any debt "for willful or malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. 523(a)(6). For this exception to apply, the creditor must have suffered an injury, the debtor must have intended to cause the injury or there must have been a substantial certainty that the injury would occur, and the debtor had no justification or excuse for the action resulting in the injury. *Liddell v. Peckham (In re Peckham)*, 442 B.R. 62, 78 (Bankr. D. Mass. 2010). The debtor must intend the consequences of his action; specifically, he must intend the injury and not just the action itself. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998).

To avoid summary judgment on this count LFS must establish a material issue of disputed fact. Nothing in the record suggests that by agreeing to the June 14, 2007 loan proposal, which describes the loan transaction as including a first mortgage on the Charlton/Oxford Property owned by GEM, Mr. Gemme intended to cause injury to LFS. On the contrary, GEM's two year track record of loan repayments suggests that at the time of the loan proposal and subsequent closing, Mr. Gemme had every intention of repaying the loan. Accordingly, summary judgment in favor of Mr. Gemme is appropriate on count II of the amended complaint.

Count III: Section 523(a)(2)(B)

LFS asserts that because Mr. Gemme's personal financial statement[2] was inaccurate, its claim is nondischargeable pursuant to § 523(a)(2)(B) which excepts from discharge debts obtained

---

[2] The amended complaint alleges that the financial statement was that of GEM, however, Mr. LaChance's affidavit in opposition to the summary judgment motion and the exhibit attached correctly identifies the financial statement as the personal statement of Mr. Gemme.

8

by use of a statement in writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with intent to deceive. 11 U.S.C. § 523(a)(2)(B).

A creditor must have actually and reasonably relied on a false written statement in order to succeed on a § 523(a)(2)(B) claim. *Kosinski*, 424 B.R. at 612. Reasonable reliance invokes a more demanding standard than justifiable reliance. Reasonable reliance is to be determined by weighing factors including:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Middlesex Sav. Bank v. Flaherty (In re Flaherty)*, 335 B.R. 481, 490 (Bankr. D. Mass. 2005) (internal citations omitted). *See also Kosinski*, 424 B.R. at 612 (listing the same factors of reliance).

Reliance is not reasonable when warning signs such as inconsistencies within the financial statement would put an ordinarily prudent lender on notice that the statement may be unreliable. Here, a cursory review of Mr. Gemme's personal financial statement raises red flags. Mr. Gemme lists his holdings of "non-readily marketable securities" as worth $1 million. But in schedule A of his financial statement where he is instructed to itemize these securities, Mr. Gemme lists GEM Builders, Inc. with a value of $6 million and Elly Pond with a value of $1.5 million. This $5.5 million discrepancy should have stopped LFS in its tracks. There is a similar inconsistency regarding Mr. Gemme's real estate holdings and mortgage debt. Mr. Gemme lists

his residential and investment real estate as being valued at $1 million but in schedule C where detail for such value is provided he values it at $1.4 million. Likewise Mr. Gemme lists his mortgage debt as totaling $300,000 but in the accompanying detail it totals $390,000. No reasonably prudent lender would have relied on a financial statement as facially flawed as the one submitted by Mr. Gemme.

Because LFS' reliance on Mr. Gemme's financial statement was not reasonable, Mr. Gemme is entitled to summary judgment on count III of the amended complaint.

### Conclusion

For the foregoing reasons, summary judgment shall enter in favor of Mr. Gemme on all counts of the complaint.

A separate order shall issue.

Dated: September 27, 2011

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   John A. Burdick
Paxton, MA
for LaChance financial Services, Inc.

Lawrence E. Cohen
Worcester, MA
for David E. Gemme